# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS

Filed: March 26, 2026

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | | |
|---|---|---|
| LISA L. ARREDONDO, | \* | PUBLISHED |
| | \* | |
| Petitioner, | \* | No. 18-1782V |
| | \* | |
| v. | \* | Special Master Nora Beth Dorsey |
| | \* | |
| SECRETARY OF HEALTH | \* | Ruling Awarding Damages; Influenza |
| AND HUMAN SERVICES, | \* | ("Flu") Vaccine; Bell's Palsy; Pain and |
| | \* | Suffering; Life Care Plan. |
| Respondent. | \* | |
| | \* | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

<u>Lisa Roquemore</u>, Law Office of Lisa A. Roquemore, Rancho Santa Margarita, CA, for Petitioner.
<u>Kimberly Shubert Davey</u>, U.S. Department of Justice, Washington, DC, for Respondent.

## **RULING ON DAMAGES**[1]

On November 19, 2018, Lisa L. Arredondo ("Petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program ("Vaccine Act" or "the Program"), 42 U.S.C. § 300aa-10 <u>et seq.</u> (2018)[2] alleging that she suffered Bell's palsy as the result of an influenza ("flu") vaccination administered on September 21, 2017. Petition at 2 (ECF No. 1). On October 31, 2023, the undersigned issued a Ruling on Entitlement, finding Petitioner entitled to compensation. Ruling on Entitlement dated Oct. 31, 2023 (ECF No. 92).

---

[1] Because this Ruling contains a reasoned explanation for the action in this case, the undersigned is required to post it on the United States Court of Federal Claims' website and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Ruling will be available to anyone with access to the Internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, the undersigned agrees that the identified material fits within this definition, the undersigned will redact such material from public access.

[2] The National Vaccine Injury Compensation Program is set forth in Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755, codified as amended, 42 U.S.C. §§ 300aa-10 to -34 (2018). All citations in this Ruling to individual sections of the Vaccine Act are to 42 U.S.C. § 300aa.

The parties were unable to resolve damages and requested that the Court enter a schedule for damages briefs.  Since then, the parties' briefs have been filed.

After consideration of all of the evidence, and for the reasons described below, the undersigned finds that Petitioner is entitled to $180,000.00 for actual pain and suffering.  This Ruling also awards the costs for certain disputed items in the life care plan.

## I.    PROCEDURAL HISTORY

Petitioner filed her petition on November 19, 2018.  Petition.  The early procedural history from November 2018 through March 2023 was set forth in the undersigned's Ruling on Entitlement and will not be repeated here.  See Ruling on Entitlement at 4-5.

Following the undersigned's Ruling on Entitlement, the parties engaged in settlement discussions but were not able to resolve this matter informally.  The parties indicated that certain life care plan items as well as pain and suffering remained in dispute.[3]  See Joint Status Report ("Rept."), filed Oct. 16, 2025 (ECF No. 156); Joint Status Rept., filed Mar. 25, 2026 (ECF No. 162).  The parties briefed the issue of pain and suffering and provided additional evidence in support of the parties' positions on the remaining items in dispute in the life care plan.  See Petitioner's Exhibits ("Pet. Exs.") 114-22; Respondent's ("Resp.") Exs. J-K; Pet. Damages Brief in Support of Her Pain Suffering and Emotional Distress ("Pet. Br."), filed June 19, 2025 (ECF No. 146); Resp. Response to Pet. Br. ("Resp. Br."), filed Sept. 17, 2025 (ECF No. 152); Pet. Reply Damages Br. in Support of Her Pain Suffering and Emotional Distress ("Pet. Reply Br."), filed Oct. 16, 2025 (ECF No. 155).

This matter is now ripe for adjudication.

## II.    FACTUAL HISTORY[4]

### A.    Medical Record History

Petitioner was a 51-year-old registered nurse at the time of her flu vaccination on September 21, 2017.  Pet. Ex. 1 at 1; Transcript ("Tr.") 7.  Petitioner's medical history prior to

---

[3] The parties were able to resolve lost wages ($1,552.88), out-of-pocket expenses ($10,312.87), and most items in the life care plan.  See Joint Status Report ("Rept."), filed June 6, 2025, at 1 (ECF No. 140); Joint Status Rept., filed Mar. 2, 2026 (ECF No. 159).  The parties confirmed that the only items in dispute are past and future pain and suffering and certain life care items.  Joint Status Rept., filed Mar. 25, 2026 (ECF No. 162).

[4] This factual history was largely taken from the undersigned's Ruling on Entitlement as well as the parties' damages briefs, with edits from the undersigned, as the undersigned finds the parties accurately depicted the facts and circumstances here.  See Ruling on Entitlement at 5-11; Pet. Br. at 2-11; Resp. Br. at 2-9.

vaccination did not suggest facial weakness or a neurological condition.  Resp. Br. at 2-3 (citing Pet. Ex. 3 at 20-26).

Thirteen days later, on October 4, 2017, Petitioner presented to her primary care physician ("PCP") for paresthesia, "drooping right eye," and pain in her ear that started three days prior.  Pet. Ex. 3 at 27.  Associated symptoms included "difficulty closing eye, drooping lower eyelid, facial muscle weakness[,] and pain near the ear."  Id.  Petitioner was diagnosed with paresthesia and Bell's palsy, prescribed acyclovir and steroids, and magnetic resonance imaging ("MRI") was ordered.  Id. at 29-30.  A brain MRI performed without contrast on October 9 showed "[n]o significant intracranial abnormality."  Id. at 32.

On October 10, 2017, Petitioner's employer submitted a Vaccine Adverse Event Reporting System ("VAERS") report on her behalf.  Pet. Ex. 2.  The adverse event was described as facial paralysis and neck pain following the flu vaccine.  Id. at 3.  It reported that Petitioner "woke up the night of [October 1, 2017] with pain in neck and left sided drooping[5] which ha[d] not yet resolved;" diagnosis was Bell's palsy.  Id.

Petitioner returned to her PCP on October 11, 2017 "for evaluation of Bell's palsy with inability to smile and pain in right ear."  Pet. Ex. 3 at 33.  Associated symptoms included difficulty drinking, eating, and speaking, facial muscle weakness, pain near the ear, difficulty closing eye, drooping lower eyelid, drooling, hearing loss, and lack of tears or sensitivity to light.  Id.  Petitioner reported "her [Bell's] palsy [was] somewhat improving but she continue[d] to have pain above her right ear [and] right side of face."  Id.  Diagnosis was Bell's palsy.  Id.  She was prescribed prednisone and tramadol for pain and was instructed to follow up if there were no improvements in symptoms in two weeks.  Id.

At an optometry appointment in December 2017, Petitioner reported a "noticeable decline or change in vision."  Pet. Ex. 5 at 4.  Notes indicated Petitioner was "[r]eferred to Patti Wieissler for acupuncture for [r]ight side [B]ell's palsy [with] October 2017 onset."[6]  Id. at 5.

On March 28, 2018, Petitioner followed up with her PCP.  Pet. Ex. 3 at 40.  Petitioner reported she was "still having issues from her Bell's palsy," including right eye twitching when she smiled, soreness on the right side of her face, some hearing loss in her right ear, and occasional blurry vision in her right eye.  Id.

Petitioner presented to neurologist Dr. Peter Tarbox for a neurological consultation for her eight-month history of Bell's palsy on June 18, 2018.  Pet. Ex. 7 at 1.  Petitioner had "numbness and tingling to the face and some dryness of her vision.  She ha[d] decreased field loss to the right."  Id.  Petitioner reported she had "some recovery with some kinesis noted."  Id.

---

[5] Reference to left-sided drooping appears to be an error, since all other records document drooping of the right eye and right-sided symptoms.  At the entitlement hearing, Petitioner discussed this note and testified that the report inaccurately noted her facial drooping to be on the left side instead of the right.  Tr. 12-14.

[6] It is not clear whether Petitioner underwent acupuncture as no records were filed.

It was also noted she had "no significant lower [seventh] nerve recovery resulting with flattening of the smile." Id. Neurological examination showed "right peripheral VII [cranial nerve] weakness on the right." Id. at 3. "She [was] able to close her eyes but [did] have orbicularis oculi eye weakness. She [was] [] able to elevate the right eyebrow. Her orbicularis oris appear[ed] to be weak. She ha[d] some decreased sensitivity to touch subjectively in the right VII [and eight cranial nerve regions]."[7] Id. The remaining cranial nerves were intact. Id. Dr. Tarbox's impression was Bell's palsy and polyneuropathy. Id. at 3-4. He recommended electrical stimulation, massages, and acupuncture. Id. at 4. Dr. Tarbox advised Petitioner that given she was "eight to nine months [into] recovery there may be minimal significant recovery from [her current] state," but that nerve recovery was still possible for up to 18 months. Id.

On August 13, 2018, Petitioner followed up with Dr. Tarbox. Pet. Ex. 7 at 18. She reported "no Bell's palsy flare ups" since her last visit but continued to have "numbness and tingling on [her] right side with a mild facial droop." Id. Dr. Tarbox recommended Bell's palsy specific physical therapy ("PT"). Id. at 20.

Petitioner completed three sessions of PT from August 28 to September 11, 2018 with physical therapist Amapola Mallari. Pet. Ex. 8 at 1-8. At the initial PT consultation, an examination documented decreased right-sided brow elevation, brow depression, and a right-sided decrease in smiling, puckering, nostril flaring, and platysma. Id. at 2. By her third and last PT session, Petitioner demonstrated improvements with whistling, laughing, and smiling. Id. at 7.

Petitioner returned to her PCP on September 27, 2018. Pet. Ex. 3 at 45. She was still experiencing a "drooping right eye, inability to smile, and pain in [her] right ear." Id. Petitioner requested a referral to an ear, nose, and throat ("ENT") specialist. Id. at 47.

On September 28, 2018, Petitioner presented to ENT Dr. Walter Bain. Pet. Ex. 6 at 1. History indicated she had hearing loss, taste decrease, and vertigo due to her Bell's palsy. Id. She also reported a "wind type sound" in her right ear with smiling, eating, or talking. Id. Examination showed a 50% reduction in strength on the right side of her face, cerumen impaction, and mild bilateral sensorineural hearing loss with audiology measurements in the normal range.[8] Id. at 2-4. Dr. Bain removed Petitioner's cerumen impaction and prescribed a nasal spray to treat her eustachian tube dysfunction. Id. at 4-5.

Petitioner had a speech evaluation on January 29, 2019. Pet. Ex. 40 at 1. Petitioner described difficulty eating and drinking as well as pain when she moved the right side of her face. Id. Petitioner also reported "sharp pain" during facial exercises and "pressure in her ear when she smiles." Id. Examination revealed Petitioner had a moderate right-sided facial droop when smiling; she could not contain air pressure in her mouth due to right cheek weakness; and

---

[7] On neurological examination, Dr. Tarbox also noted decreased sensitivity in the distribution of the eighth cranial nerve. Pet. Ex. 7 at 3.

[8] The audiogram showed mild relative elevation thresholds but were largely within normal limits. Pet. Ex. 38 at 1.

she could not raise her right eyebrow.  Id. at 2.  Petitioner had no issues chewing but her swallow test revealed mild difficulty securing a bolus and mild right-sided anterior leakage.  Id.  Assessment noted Petitioner had mild oral dysphagia secondary to her facial weakness due to Bell's palsy.  Id. at 3.  After reviewing her history and prior testing, the speech therapist did not recommend speech therapy due to Petitioner's "very poor rehabilitative potential."  Id.  It was also noted that Petitioner was "not expected to make progress via skilled speech therapy services."  Id.

On March 1, 2019, Petitioner saw her dentist[9] and asked if Bell's palsy could impact her oral health.  Pet. Ex. 41 at 3.  She was told that if her condition causes dry mouth, it could result in increased caries and higher risk for "burning mouth syndrome, oral mucositis[,] and . . . fungal infections."  Id.  The dentist recommended oral lubricants, like NeutraSal, to alleviate dry mouth and provide protective benefits.  Id.  Petitioner was also advised to seek dental care more than twice a year to monitor her oral health.  Id.  On examination, Petitioner had good oral hygiene, with only light plaque, and she was encouraged to continue brushing and flossing.  Pet. Ex. 43 at 1.

On March 5, 2019, Petitioner presented Dr. Lance Jackson, another ENT, for complaints of dizziness, hearing loss, ear pain, pain swallowing, difficulty with speech, and facial weakness.  Pet. Ex. 38 at 1-3.  Petitioner's Bell's palsy symptoms included facial weakness, right eye/mouth dryness, right aural fullness, right tinnitus, dizziness/imbalance, right-sided constant aural fullness, and temporary right-sided hearing loss.  Id.  "She also [] noted that her right sided hearing [] decreased when the aural fullness [was] severe."  Id.  Petitioner's dizziness/imbalance "occurred more in the morning and late afternoon" and was of "mild severity, although it [] fluctuated in severity and [] worsen[ed] when her right aural fullness [was] most pronounced."  Id.  Her tinnitus was described as "humming" that "occurred 1-2 times daily and [] lasted for seconds at a time."  Id.  Lastly, she reported "right sided pain below her right ear which radiate[d] to her jaw."  Id.  Over the first three months after her diagnosis, Petitioner reported a 50% improvement in facial function, however, she continued to have residual facial weakness.  Id.  Petitioner also "reported allergy symptoms described as nasal congestion, nasal discharge, postnasal drip, and eye dryness."  Id.

Petitioner's examination by Dr. Jackson, including audiogram and tympanograms, was normal.  Pet. Ex. 38 at 2-5.  House-Brackman[10] grade was noted to be "II-III/VI" on the right side.  Id. at 4.  Petitioner had another MRI which was normal.  Id. at 8.  The treatment plan included further testing to find the cause of the dizziness and hearing symptoms.  Id. at 5-6.  Facial physical therapy was also recommended.  Id. at 5.

---

[9] Despite evidence of significant prior dental work, including several missing teeth, cosmetic Lumineers, and crowns and fillings, no dental records were filed for care between 2012 and March 2019.  See Pet. Exs. 41, 43, 100.

[10] The House-Brackmann facial nerve grading system is the most widely applied scoring system "available to clinically assess the severity of peripheral facial nerve palsy."  Pet. Ex. 19 at 2 (A. Greco et al., Bell's Palsy and Autoimmunity, 12 Autoimmun. Rev. 323 (2012)).  The House-Brackman grading scale goes from Grade 1 (normal) to Grade 6 (total paralysis).  Id. at 3 tbl.b.

On March 19, 2019, Petitioner was examined by plastic surgeon, Dr. Agustin Cornejo, for right-sided asymmetry of her forehead, brows, and mouth.  Pet. Ex. 39 at 1-2.  Dr. Cornejo recommended Botox therapy.  Id. at 3.

On May 30, 2019, Petitioner presented to Dr. Cristo Calle, internist, with complaints of dry eyes and mouth and right-sided face pain rated 2-3/10.  Pet. Ex. 42 at 1.  Dr. Calle recommended eye drops, saliva stimulants, acupuncture, and Botox as treatment.  Id. at 3-4.

On June 24, 2019, Petitioner presented to ophthalmologist Dr. Sean Paul with a chief complaint of ptosis for the past two years, which Dr. Paul labeled as moderate in severity.  Pet. Ex. 44 at 1.  Dr. Paul diagnosed Petitioner with lagophthalmos in the right eye (the inability of the upper and lower eyelids to meet upon closing) and informed her that the condition may improve without treatment.  Id.  Dr. Paul discussed surgical options, but Petitioner chose to defer a decision on surgery at that time.  Id. at 2.

A few months later, on October 2, 2019, Petitioner had an initial PT examination with Diana Schonoff, Doctor of PT, at Garden Ridge Physical Therapy & Wellness Center.  Pet. Ex. 45 at 1.  It was noted that Petitioner got the flu vaccine on September 21, 2017, then two weeks later, on October 1, 2017, developed "pain posterior [right] ear to jaw . . . then facial paralysis [right] side."  Id. at 2.  Petitioner reported she did not go to PT as previously recommended "but [she was] ready now."  Id.  Petitioner's chief complaints included pain, swelling, and numbness in her right facial, ear, and neck region as well as issues with eating and swallowing.  Id.  She reported feeling "self conscious eating or talking in front of people due to synkinesis eye closure with mouth movements."  Id.  House-Brackman was a grade III.  Id.  Dr. Schonoff recommended PT two to three times per week.  Id. at 3-4.  Petitioner attended a total of 18 sessions through November 18, 2019.  Id. at 18.  During PT, Petitioner was consistently noted to have facial swelling due to lymphedema, which was treated with a pressure garment, and she demonstrated some improvement with increased facial strength, decreased eye twitching, and significantly decreased spasms and tightness.  Id.

One year later, on October 23, 2020, Petitioner had a telehealth visit with Dr. Maria Alvarez of Neurology Associates for her Bell's palsy.  Pet. Ex. 56 at 1.  Petitioner reported an involuntary right-sided facial twitch that was "worse when she [was] tired" and a "heaviness of [her] right face."  Id.  Petitioner reported that the involuntary twitch affected her speech but did not cause any slurring or choking.  Id.  On examination, Dr. Alvarez noted mild right-sided hemifacial spasm and mild right-sided facial weakness.  Id. at 2.  The use of Botox injections and possible gamma knife surgery were discussed.  Id.

Petitioner began Botox treatment in December 2020 and continued to receive Botox through December 2024.  Pet. Ex. 59 at 1, 3; Pet. Ex. 60 at 1; Pet. Ex. 61 at 1, 3-4; Pet. Ex. 62 at 1-2, 5; Pet. Ex. 64 at 2; Pet. Ex. 89 at 1-4; Pet. Ex. 93 at 1-12; Pet. Ex. 99 at 1-4; Pet. Ex. 114 at 1-4.  Petitioner reported her facial spams were "stable" and getting "better with therapy."  Pet. Ex. 62 at 1; see also Pet. Ex. 61 at 1.

6

On October 25, 2021, Petitioner saw her dentist for a bi-annual appointment.  Pet. Ex. 100 at 3.  Petitioner complained of sensitivity when biting.  Id.  Light tarter buildup was noted on examination.  Id.

Petitioner returned to the dentist six months later, on April 28, 2022, for sensitivity in a tooth that had a ten-year-old filling, and she was found to have an abscess.  Pet. Ex. 101 at 1. She had a root canal and crown in May 2022.  Id. at 1-3.  In June 2022, she underwent additional dental work due to fractures in two different teeth.  Id. at 4-5.  In August 2022, Petitioner began treatment with Invisalign.  Id. at 5-6.

On March 9, 2023, Petitioner saw her dentist for a routine periodontal examination, and she was noted to have gingival inflammation due to a buildup of calculus at the gumline.  Pet. Ex. 101 at 7-8.  There were no concerns noted regarding dry mouth, but Petitioner was encouraged to brush three times a day with an electric toothbrush and to floss nightly.  Id. at 8. On September 12, 2023, at Petitioner's next routine dental examination, she was noted to have plaque-induced gingival inflammation.  Id. at 9.  Petitioner was again counseled to brush three times a day and to floss nightly.  Id. at 10.  On September 18, 2023, Petitioner received a crown on another tooth that had a filling that was over ten years old.  Id. at 10-11.

On July 25, 2023, Petitioner saw an optometrist who noted excess tearing and mild bilateral conjunctival injection consistent with allergies.  Pet. Ex. 95 at 2.  Petitioner also reported significant itchiness in both eyes.  Id.  The optometrist also observed that Petitioner's right eyelid fell away from the normal position but considered that finding of "low clinical significance."  Id.  Assessment was lagophthalmos of both right eyelids, and she was prescribed lubricating and allergy eye drops for both eyes.  Id.  Her eyeglass prescription was updated, and her correctible vision was 20/20 in each eye.  Id.

On September 18, 2024, Petitioner was evaluated for bilateral ptosis, and a plan was made for a brow lift.  Pet. Ex. 108 at 3-4.  Her "droopy eyelids [were] "moderate in severity, right upper eyelid and left upper eyelid [were] equal."  Id. at 1.

### B.    Declarations, Testimony, and Letters

#### 1.    Petitioner

At the hearing, Petitioner testified she had been a nurse at Baptist Medical Center for 15 years prior to the flu vaccination at issue.  Tr. 7-11.  She recalled that prior to September 2017, she was in good health.  Tr. 12.  She did not have any face, eye, or lip issues prior to the flu vaccine besides needing reading glasses.  Tr. 16.

About two weeks after receiving her vaccination, Petitioner developed "a really sharp pain behind [her] [right] ear" which was unusual.  Tr. 14.  She testified it was "really painful," and "something new to [her]" as it had never happened before.  Tr. 15.  She "had never been seen by a physician for ear problems."  Id.  On October 2, 2017, Petitioner went to work, because she took some pain medicine and "the pain had subsided."  Id.  When she got to work, she felt "a little weird, tingling, [and] numbness . . . to the right side of [her] tongue."  Id.  On October 3,

Petitioner was off from work and when she woke up that morning, she noticed a drooping of her face. Id. She was unable to brush her teeth without difficulty. Id. Her eye was also affected. Id. Her face was paralyzed, "like frozen," and she was unable to close her eye. Id.

Because Petitioner had seen Bell's palsy before in the scope of her work as a nurse, she thought she was having either Bell's palsy or a stroke. Tr. 20. Accordingly, Petitioner recalled that she sought treatment from her PCP "the day after getting Bell's palsy, so it was October 4, 2017." Id. Petitioner was given medication and steroids. Tr. 22.

Petitioner recalled that she returned to her PCP on October 11, 2017 because her condition was worsening. Tr. 22. She was having "a lot of dryness to [her] eye, dryness to [her] mouth, . . . a lot of pain, [and] a lot of spasms, like charley horses [in] back of [her] ear to the jaw area, pulling of [her] neck." Id. She had problems eating and drinking, drooling, and sensitivity of her ear and right side. Tr. 22-23. Because she could not close her eye, it was dry and irritated. Tr. 23. She developed blurred vision and used lubricating ointment and eyedrops. Id. Petitioner wore an eye mask at night to sleep and when she showered, she put a towel band over her eye to prevent soap from getting into her eye. Tr. 24.

In her testimony, Petitioner stated that her final diagnosis was Bell's palsy. Tr. 23. She testified that her treating physicians believed the cause was "possibl[y] [the] flu vaccine." Id. She saw a neurologist in June 2018 due to continued symptoms. Tr. 25. Recommended treatment included physical therapy, Botox, and acupuncture. Tr. 25-26. Petitioner underwent all of the recommended treatment.[11] Id. Petitioner also described the photographs filed showing the effect of Bell's palsy on her facial appearance. Tr. 17-19.

As of the date of the hearing, October 18, 2022, Petitioner was still experiencing "synkinesis, [] blurriness, and vision problems." Tr. 26. She was still unable to completely close her eye and had continued dryness of her eye and mouth. Id. She also had difficulty chewing food and had spasms of the right side of her face. Id.

Petitioner also filed two supplemental declarations in 2025. Pet. Exs. 119-20. In the first declaration, signed June 17, 2025, Petitioner explained her Bell's palsy symptoms have been "traumatic and horrifying," and she has continued to suffer "significant pain, depression, anxiety[,] and overall loss of self esteem." Pet. Ex. 119 at ¶ 4. She "felt helpless and overwhelmed," "lost [her] marriage," "sought counseling from [her] trusted Pastor . . . to assist with [her] psychological wounds, depression[,] and [] anxiety." Id. Petitioner explains she "ha[s] had a difficult time coping with [her] disfigurement and [] pain," which was a 10/10 in the beginning and is now a 3-4/10, constant, and dull. Id. She also "worr[ies] about [] upcoming surgeries and recovery. It's the fear of the unknown and potential complications . . . [as well as] post surgery pain and bruising." Id. at ¶ 5.

Petitioner asserts her Bell's palsy "has had a very negative impact on [her] self image;" she continues to avoid photographs, social interactions, and eye contact because she is self-conscious about her face. Pet. Ex. 119 at ¶ 6. Her "decrease in social interaction has led to

---

[11] Acupuncture records do not appear to be filed.

loneliness, isolation, and depression." Id.  And she finds it "challeng[ing] trying to mentally and emotionally cope with all of these issues." Id.  She also explained that she continues to experience loss of taste, dryness, and numbness and continues to drop food and liquids from her mouth.  Id.  Petitioner maintains her Bell's palsy has affected her "daily life, work life, social life[,] and romantic life." Id. at ¶ 7.

The second declaration, signed October 13, 2025, addresses the effect of her Bell's palsy on her marriage and family life.  Pet. Ex. 120.  Petitioner asserts the nature and quality of her marriage was impacted because her husband immediately moved to Florida for contract work and only returned intermittently a few times.  Id. at ¶ 5.  Petitioner is "certain" her Bell's palsy impacted her marriage.  Id.  She maintains they have been separated "since [he] left" and "[h]e has lived in Florida since [her] injury." Id. at ¶¶ 6-7.  She explained she "ha[s] not had the emotional strength to go through a dissolution," and thus, they are technically still married.  Id. at ¶ 7.  Despite this, she maintains "that does not make [her] emotional issues attendant to [her] Bells Palsy issues and [her] husband leaving any less devastating." Id.

### 2.    Petitioner's Mother, Esther Arredondo

Petitioner's mother, Esther Arredondo, signed a declaration on October 13, 2025, to support Petitioner's assertion that her husband left her due to her Bell's palsy.  Pet. Ex. 121.  She lived with Petitioner from 2018 to May 2025.  Id. at ¶¶ 4-5.  She explained that Petitioner's husband, Martin, did not live with Petitioner at this time.  Id. at ¶ 6.  For the first three years of Petitioner's Bell's palsy injury, he had six-month work contracts out of state and would return for a week or two until his next contract began.  Id.  Ms. Arredondo maintains that he would return "only for his benefit" and that "[t]his was not a marriage." Id.  "He was not by any stretch of the imagination a husband to [Petitioner]," according to Ms. Arredondo, and he has not returned since 2020.  Id.  Ms. Arredondo "believe[s] [Petitioner's] husband left because he could not deal with [Petitioner's] bell's palsy and her marred beauty." Id. at ¶ 7.

Ms. Arredondo also explained what she has witnessed Petitioner go through, physically and emotionally, since her Bell's palsy diagnosis.  Pet. Ex. 121 at ¶ 7.  Petitioner continues to have facial pain and tightness, she drools when eating, her right eye twitches and squints when she speaks and blinks, and she has a lopsided smile, which has made her embarrassed to take photographs and eat in front of others.  Id.  Ms. Arredondo noted Petitioner "believes her father was overworked from maintaining [Petitioner's] 5-acre home," which led to his heart attack and death.  Id.  Ms. Arredondo also explained Petitioner struggles financially due to the lack of support from her husband, which required a change in her work schedule to compensate.  Id.

### 3.    Reverend Mike Barron

Reverend Mike Barron has known Petitioner for over 40 years.  Pet. Ex. 116 at 1.  He stated that he "witnessed the pain and suffering she was experienc[ing] following Bell's [p]alsy and what effect it had on her life." Id.  Petitioner reported "considerable facial pain, sadness[,] and discouragement." Id.  She "presented herself feeling distressed, frustrated, [and] anxious because her face was significantly distorted" and she was embarrassed of her difficulty speaking and eye and mouth spasms.  Id.  Petitioner also reported her Bell's palsy affected her daily

routines, work, social life, and marriage; she no longer had the "desire" or "motivation" to eat out at restaurants or attend church functions, and she was hesitant to take photographs with family and friends. Id.

## III.    PAIN AND SUFFERING

### A.    Parties' Pain and Suffering Contentions

#### 1.    Petitioner's Contentions

Petitioner requests a pain and suffering award of $250,000.00. Pet. Br. at 15; Pet. Reply Br. at 15. If Petitioner is not granted the statutory cap of $250,000.00 for past pain and suffering, she requests future pain and suffering until she meets the cap. Pet. Reply Br. at 15.

Petitioner maintains that she has been cognizant of the pain and emotional distress she has endured due to her Bell's palsy since the onset. Pet. Br. at 11.

As to duration, Petitioner contends her injury "has been anything but brief;" she has suffered since October 2017, over eight years, and continues to suffer. Pet. Br. at 11.

For severity of injury, Petitioner maintains "[h]er life has not been and never will be the same." Pet. Br. at 11-12. Petitioner summarizes her Bell's palsy resulted in her "losing [] her marriage and the ability to be kissed and be intimate;" has had an "impact on her psyche" due to her "[n]ot being able to smile, kiss, [and] eat comfortably in front of people;" has led her to be unable to socialize like she used to; and has resulted in pain. Id. at 12.; see also Pet. Reply Br. at 6. She hopes recommended surgeries will fix her face disfigurement so that her self-esteem can improve; however, she believes "[i]t is unlikely her marriage will heal after this length of time." Pet. Br. at 12. And even after these surgeries, she will continue to suffer "due to eye issues and sensitivity of hearing." Id. Overall, she classifies her facial palsy as "at least[] moderate" as evidenced by the need for Botox and surgery." Pet. Reply Br. at 11.

Petitioner details all that she has endured due to her Bell's palsy. Pet. Reply Br. at 3-4. She has difficulty eating, drinking, and brushing her teeth; she is embarrassed to eat in front of others; she has lost her sense of taste on the right side of her mouth, and the "decrease in her ability to taste has [had] a significant impact on the pleasure and gratification she used to have in terms of eating food;" she has dryness and sensitivity to temperature on the right side of her mouth; she has difficulty speaking and saying certain words/letters as well as smiling; she has synkinesis and involuntary muscular movements accompanying voluntary movement; she has right eye dryness due to her inability to close it, requiring eye drops, ointments, and tape to close her eye, which has also affected her vision; and she has hyperacusis (where soft sounds cannot be heard and loud sounds are intolerable or distorted), ear pain, and hearing loss. Id. These issues, Petitioner asserts, have had a negative impact on her work life, social life, and activities of daily living. Id. at 4, 6.

Her Bell's palsy has also greatly impacted her marriage and social life. Pet. Reply Br. at 6. "Her mood can change from irritable to very sensitive. . . . She is very sensitive to how she

10

looks as now she has a disfigured face and believes such has had an impact with her husband, who took a three month agency contract position in Florida." Id. Petitioner asserts her marriage is still impacted by her injury; though they are not divorced, they continue to live separate lives in different states. Id. at 8.

Petitioner maintains her case is unique in the Vaccine Program due to her injury of Bell's palsy and her pain and suffering and emotional distress. Pet. Br. at 14; Pet. Reply Br. at 13-14. Petitioner cited to Fu et al.[12] to support her contentions. Pet. Br. at 14-15 (citing Pet. Ex. 117). Fu et al. studied the psychological distress in 103 patients with facial palsy. Pet. Ex. 117 at 1. The authors found "[f]emales had significantly higher levels of anxiety compared to males," which they noted was "possibly owing to the great emphasis placed on their appearance by society," while "[f]emale and male participants were equally likely to experience high levels of depression." Id. at 1, 4. The number of female and male participants was not noted. See id. at 1-5. The study found "significant associations between participants' illness perceptions and their level of distress" as well as "strong evidence that unplanned alteration of the face will cause psychosocial problems." Id. at 1, 5. Petitioner asserts the "facial disfigurement and the functional ramifications described in [Fu et al.]" is akin to what she went through—"[she] has anxiety and depression, her quality of life has been diminished[,] and she has suffered from impaired interpersonal relationships." Pet. Br. at 15; see also Pet. Reply Br. at 6.

In her reply brief, Petitioner distinguishes her case from the petitioner in Sturdevant, who also suffered Bell's palsy with permanent residual effects. Pet. Reply Br. at 12 (citing Sturdevant v. Sec'y of Health & Hum. Servs., No. 17-172V, 2024 WL 1045145 (Fed. Cl. Spec. Mstr. Feb. 12, 2024)). Mr. Sturdevant had mild disfigurement, his records documented a "pleasant face," and he did not undergo invasive treatments or procedures, while Petitioner here continues to have facial disfigurement, she received Botox treatments and will continue to do so, and she will have a corrective surgery. Id.; see also Sturdevant, 2024 WL 1045145, at *7-8, *10.

Petitioner maintains she is entitled to an award of no less than $250,000.00 for her pain and suffering and emotional distress that she has suffered over the last eight years and will continue to suffer for at least a few more years. Pet. Reply Br. at 15.

### 2.    Respondent's Contentions

Respondent argues that based on the facts of this case, Petitioner should be awarded $140,000.00 for pain and suffering. Resp. Br. at 1. Respondent contends that Petitioner is not entitled to the pain and suffering statutory cap of $250,000.00 because she "is not among the most severely injured petitioners in the Program, she has achieved some recovery with treatment, and her case is distinguishable from other cases in which petitioners were awarded the statutory cap for pain and suffering." Id. at 12.

First, Respondent does not dispute awareness of injury. See Resp. Br. at 1-22.

---

[12] L. Fu et al., Psychological Distress in People with Disfigurement from Facial Palsy, 25 Eye 1322 (2011).

Respondent compares this case with Sturdevant, arguing Sturdevant is instructive as it is the only Bell's palsy reasoned damages case with "roughly comparable facts."[13] Resp. Br. at 12-15, 21. Petitioner here and the petitioner in Sturdevant "suffered similar symptoms with similar sequela," and both will likely never fully recover. Id. at 13-14. Respondent acknowledges there are differences between Petitioner's case and that of the petitioner in Sturdevant. Id. Respondent notes Petitioner here received more treatment than Mr. Sturdevant, including two rounds of PT and three Botox injections each year since December 2020, while Mr. Sturdevant's treatment was limited to steroids, physical therapy, and home exercises. Id. at 14. And Respondent agrees "there is evidence [Petitioner] will require ongoing Botox injections and possible surgery to correct her persistent facial asymmetry," which was not present in Mr. Sturdevant's case. Id. at 15. Respondent maintains Sturdevant is instructive "as [P]etitioner's clinical course was similar to Mr. Sturdevant's;" however, because "[P]etitioner pursued far more treatment than Mr. Sturdevant, her award should be higher, but no more than $140,000.00." Id. at 18.

Respondent next notes that "[w]hile [P]etitioner states that she has suffered more extensive pain and suffering, the record as a whole does not substantiate several of her concerns." Resp. Br. at 15. First, with regard to Petitioner's assertion her marriage was negatively impacted by her Bell's palsy, Respondent notes the records do not support her claim. Id. Respondent acknowledges Petitioner feels her husband left her due to her Bell's palsy, but notes he left to fulfill an out-of-state employment contract in Florida and would return home when not on contract. Id. There is no objective evidence on the record to support her assertion that her husband left due to her Bell's palsy symptoms or that the symptoms caused any issues within their marriage. Id. (citing Gentile v. Sec'y of Health & Hum. Servs., No. 16-980V, 2020 WL 3618909, at *7 (Fed. Cl. Spec. Mstr. June 5, 2020) (considering a letter, affidavit, and testimony from the petitioner's ex-husband stating the vaccine injury was a contributing factor to their divorce)).

Second, Respondent notes there are no records showing Petitioner sought care for anxiety or depression related to her Bell's palsy. Resp. Br. at 16. On two occasions, she reported psychological symptoms, including "mild intermittent" anxiety, depression, stress, sadness, and insomnia on September 27, 2018, and feeling self-conscious due to her synkinesis on October 2, 2019. Id. (citing Pet. Ex. 3 at 45; Pet. Ex. 45 at 2). Respondent agrees Petitioner "likely experienced distress outside of these two dates" but asserts these concerns were not raised with medical providers. Id.

Third, Respondent points out that medical records do not support Petitioner's contentions that she suffered tongue paralysis or cannot entirely close her mouth and cites medical records in support. Resp. Br. at 17 (citing Pet. Ex. 40 at 2 (a speech evaluation documenting normal tongue

---

[13] Respondent also addresses the cases Petitioner relies upon as comparable, though they "involv[ed] entirely different conditions, and numerous cases resolved via proffer, where the underlying facts were not included in a published decision." Resp. Br. at 18-20. Due these issues raised by Respondent, as well as the fact there are two reasoned Bell's palsy damages decisions to compare to Petitioner's case here, the undersigned does not discuss these cases.

12

strength, range of motion, and sensation; no issues with mastication or swallowing; and only mild right-sided weakness involving labial closure related to consumption of thin liquids)).

Petitioner also reports a loss of taste; however, she only reported a decrease in taste at an ENT appointment in September 2018 and not at any future appointments, including an ENT appointment in May 2019.  Resp. Br. at 17 (citing Pet. Ex. 6 at 1; Pet. Ex. 38 at 1).

As to her claims of vision loss, Respondent notes she had eyeglasses prior to her Bell's palsy, and there is no evidence of permanent vision changes.  Resp. Br. at 17-18 (citing Pet. Ex. 5).

Next, Respondent contends Petitioner's assertions of speech difficulties are not substantiated by the record.  Resp. Br. at 18.  Respondent cited Petitioner's speech evaluation, which did not document these issues.  Id. (citing Pet. Ex. 40 at 1).

Lastly, Respondent noted Petitioner has not shown her employment has been adversely affected by her injury as she contends.  Resp. Br. at 18.

Respondent maintains Petitioner has failed to show a pain and suffering award of $250,000.00 is supported by the facts of her case or comparable cases, and instead Respondent contends a pain and suffering award of $140,000.00 should be awarded to Petitioner given her overall clinical course and extensive treatment.  Resp. Br. at 12, 21.

### B.        Pain and Suffering Legal Framework

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000."  § 15(a)(4).  Petitioner bears the burden of proof with respect to each element of compensation requested.  Brewer v. Sec'y of Health & Hum. Servs., No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no formula for assigning a monetary value to a person's pain and suffering and emotional distress.  I.D. v. Sec'y of Health & Hum. Servs., No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("Awards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula."); Stansfield v. Sec'y of Health & Hum. Servs., No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("[T]he assessment of pain and suffering is inherently a subjective evaluation.").  Factors to be considered when determining an award for pain and suffering include: (i) awareness of the injury; (ii) severity of the injury; and (iii) duration of the suffering.  I.D., 2013 WL 2448125, at *9 (quoting McAllister v. Sec'y of Health & Hum. Servs., No. 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), vacated & remanded on other grounds, 70 F.3d 1240 (Fed. Cir. 1995)).

The undersigned may look to prior pain and suffering awards to aid in the resolution of the appropriate amount of compensation for pain and suffering in this case.  See, e.g., Doe 34 v. Sec'y of Health & Hum. Servs., 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing

improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case"). The undersigned may also rely on her experience adjudicating similar claims. Hodges v. Sec'y of Health & Hum. Servs., 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims). Importantly, however, it must also be stressed that pain and suffering is not determined based on a continuum. See Graves v. Sec'y of Health & Hum. Servs., 109 Fed. Cl. 579 (2013).

In Graves, Judge Merow rejected the special master's approach of awarding compensation for pain and suffering based on a spectrum from $0.00 to the statutory $250,000.00 cap. Judge Merow noted that this constituted "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." Graves, 109 Fed. Cl. at 589-90. Instead, Judge Merow assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. Id. at 595.

C.      **Pain and Suffering Analysis**

In determining an award in this case, the undersigned does not rely on a single decision or case. Rather, the undersigned has reviewed the particular facts and circumstances in this case, giving due consideration to the circumstances and damages in other cases cited by the parties and other relevant cases, as well as her knowledge and experience adjudicating similar cases. The undersigned has reviewed the entire record, including medical records, declarations, expert reports, and all other evidence that has been filed, and finds an award of $180,000.00 in actual pain and suffering is fair, reasonable, and appropriate here.

It is appropriate to consider the severity of the injury, awareness of the injury, and duration of the suffering when determining an award for pain and suffering and emotional distress. In this case, neither party has raised, nor is the undersigned aware of, any issue concerning Petitioner's awareness of suffering. Thus, based on the circumstances of this case, the undersigned determines Petitioner's awareness of the injury is not in dispute and she has full awareness of her suffering.

The factors that particularly influence this Decision are as follows. Regarding duration, the undersigned finds Petitioner suffered from her injury for more than eight years. Petitioner received the flu vaccine on September 21, 2017, and approximately 10 days later, on October 1, 2017, she developed Bell's palsy and she has suffered the residual effects since.

Regarding severity, the undersigned finds Petitioner had a severe injury, for which she was prescribed pain medication and steroids, underwent an MRI, four years of Botox (three rounds per year), a total of 21 PT visits, and a speech evaluation, and received medical treatment from her PCP, neurologists, optometrist and ophthalmologist, ENTs, dentists, and a plastic surgeon. Petitioner continues to experience ongoing physical sequela, including, but not limited

14

to, right-sided facial droop, uneven smile, difficulties speaking, eating, and drinking, inability to close her right eye resulting in right-eye dryness, and ear pain and hearing loss.

However, some of Petitioner's assertions are not supported by the medical records. Petitioner reports hearing loss, but two hearing evaluations determined her hearing was within normal limits. See Pet. Ex. 6 at 2-4; Pet. Ex. 38 at 1-5. Additionally, Petitioner reports her Bell's palsy injury has affected her sense of taste. However, Petitioner complained of a decrease in taste at one visit in September 2018, and no further visits document any complaints related to taste. See Pet. Ex. 6 at 1.

Additionally, Petitioner contends her injury affected her employment as well as her marriage and social life. Regarding her employment, the undersigned finds no evidence in the records her injury adversely affected her employment. The undersigned is not fully persuaded by Petitioner's assertions that her husband left her because of her Bell's palsy injury. Petitioner's husband took pre-planned contract work in Florida that began after her injury onset. Petitioner did not file evidence from her husband or other objective evidence to show the effects of her injury on their marriage. Further, Petitioner's testimony, declarations, and letters from Petitioner, her mother, and her pastor were submitted after litigation was initiated and a substantial passage of time after the onset of injury. Case law provides that statements made by interested parties in anticipation of litigation or years after the events in question are less persuasive. See Nomick v. Sec'y of Health & Hum. Servs., No. 22-1538V, 2025 WL 2953202, at *9 (Fed. Cl. Spec. Mstr. Sept. 19, 2025) ("While Petitioner has offered a total of six declarations, all were signed *three or four years* after the events in question, and after this matter was in litigation. The significant gap between the events and the testimony, along with the litigation context, greatly reduces their evidentiary value.").

The undersigned has considered prior pain and suffering awards in the parties' cases to assist in her determination of an appropriate award. There are two reasoned Bell's palsy damages decisions, both from the undersigned.

The first is Sturdevant. Sturdevant, 2024 WL 1045145. There, the undersigned awarded $100,000.00 for actual pain and suffering. Id. at *1. In that case, petitioner was 51 years of age at the time of vaccination and injury. Id. at *2. He was unable to raise his eyebrow and had weakness and difficulty closing his eyelid. Id. at *12. He also had tearing and blurriness in his affected eye. Id. PT evaluation showed he was unable to close his eye completely and unable to drink from a cup. Id. After six months of PT, Petitioner's level of function improved to 90% of his baseline, however, he was given a facial disability rating of 45 out of 100. Id. He required eye protection at work and had difficulty with hand-eye coordination and drinking liquids. Id. Two years after onset, in 2017, his Bell's palsy was described as "still quite marked." Id. A physical examination in 2023, four years later, showed no improvement; the petitioner was still unable to fully close his affected eye and he had decreased contraction of the relevant eyelid muscles. Id. He worried about losing his ability to pass the requisite visual tests to maintain his employment. Id. The award of $100,000.00 acknowledged the petitioner's long duration of facial disability (more than eight years), worry about job security, and duration of suffering. Id. at *13.

15

Like Mr. Sturdevant, Petitioner here has continued weakness in her face, issues with the affected eye, and difficulty drinking liquids.  Both Petitioner and Mr. Sturdevant attended PT and received steroids, but unlike Mr. Sturdevant, Petitioner has received more treatment, including three rounds of Botox per year since December 2020 and additional PT.  Petitioner and Mr. Sturdevant, both 51 years of age at the time of injury, also expressed concerns regarding employment and job security, though neither provided evidence of past or current effects on employment.

The second case is A.B. v. Secretary of Health & Human Services, No. 17-243V, 2025 WL 3187686 (Fed. Cl. Spec. Mstr. Oct. 20, 2025).[14]  The petitioner in A.B. was 46 years old at the time of his Bell's palsy.  A.B., 2025 WL 3187686, at *2.  He received limited medical treatment, including treatment at a local emergency room, an MRI, visits to a neurologist, an occipital nerve block, prescription medications, and chiropractic care.  Id. at *10.  He did not experience ongoing facial weakness; there was no evidence that his eye muscles had been adversely affected, he did not experience ongoing issues drinking, swallowing, or eating, and he was noted to have a complete recovery of his facial nerve movements within four years.  Id.  The petitioner in A.B. asserted issues with hearing and an uneven smile, but those deficits were not supported by the medical records.  Id.  When compared to Mr. Sturdevant, the petitioner in A.B. was noted to have a less severe physical injury.  Id. at 13.

However, the petitioner in A.B. also suffered emotional distress, which led to psychiatric care for approximately one year, a diagnosis of PTSD, and prescriptions for anxiety and depression.  A.B., 2025 WL 3187686, at *10.  After this period, he returned to his psychiatrist but described other stressors in his life unrelated to his Bell's palsy that were causing emotional distress, including marital problems.  Id. at *10-11.  Additionally, despite his contentions, he did not lose his employment due to his Bell's palsy.  Id. at *13.

Petitioner here, like the petitioner in A.B., underwent specialized treatment, though the petitioner in A.B. had a full physical recovery unlike Petitioner here.  The petitioner in A.B. suffered emotional distress and sought treatments and required medication for said distress.  Both Petitioner and the petitioner in A.B. had marital issues, though here Petitioner asserts her marital issues are due to her injury.

When comparing this case to Sturdevant and A.B., the undersigned finds significant similarities.  All three petitioners were similar in age at the time of injury.  Like Mr. Sturdevant, Petitioner continues to have physical facial deficits and suffered for over eight years.  And like the petitioner in A.B., Petitioner attained specialized care and treatment and suffered emotional distress, though she did not obtain medical care related to this distress.  All three petitioners had concerns regarding employment, but a lack of objective evidence that their employment was adversely affected by their injury.

However, there are also differences in Petitioner's case when compared to Sturdevant and A.B.  Petitioner has objectively received more specialized care and treatment.  She has worse

---

[14] This damages decision was made public after the parties completed their briefing on pain and suffering, and therefore, the parties did not discuss this case in their briefs.

physical deficits.  Petitioner cited to Fu et al. to support that she has undergone more emotional distress because she is female.

The undersigned has considered the numbers proposed by both parties, however, she does not agree that the amount suggested by either party is appropriate.

Considering the record as a whole, the undersigned finds that $180,000.00 represents a fair, reasonable, and appropriate amount of compensation for Petitioner's pain and suffering and emotional distress.  The undersigned recognizes Petitioner's duration and severity of suffering. Petitioner has required specialized treatment for her injury.  She was prescribed pain medication and steroids.  She underwent an MRI, four years of Botox (three rounds per year), a total of 21 PT visits, and a speech evaluation.  She also received medical treatment from her PCP, neurologists, optometrist and ophthalmologist, ENTs, dentists, and a plastic surgeon.  She has already suffered for more than eight years.  Although Petitioner described various issues that are not fully supported by the medical records, the undersigned finds Petitioner suffered a moderately severe injury.  Thus, the undersigned finds Petitioner's overall course to be significantly worse than those experienced by the Sturdevant and A.B. petitioners, although Petitioner here has similarities in clinical course with both the Sturdevant and A.B. petitioners. The award of $180,000.00 acknowledges that Petitioner experienced the difficulties described and acknowledges the effects it has on Petitioner's ability to enjoy certain activities and emotional distress.  The undersigned does not find a future pain and suffering award appropriate here because her condition is stable, and there is no medical evidence that she will have future pain and suffering.  Future treatment needs are covered by the life care plan for Petitioner.

## IV.    DISPUTED LIFE CARE PLAN ITEMS

### A.    Legal Framework

As previously mentioned, Petitioner "bear[s] the burden of proof with respect to each element of compensation requested."  Brewer, 1996 WL 147722, at *22; see also § 11(e) ("[P]etitioner shall submit . . . assessments, evaluations, and prognoses and such other records and documents as are reasonably necessary for the determination of the amount of compensation to be paid to, or on behalf of, the person who suffered such injury . . . .").

Compensation awarded pursuant to the Vaccine Act shall also include "[a]ctual unreimbursable expenses incurred from the date of the judgment awarding such expenses and reasonable projected unreimbursable expenses" that

(i)     result from the vaccine-related injury for which the [P]etitioner seeks compensation,

(ii)    have been or will be incurred by or on behalf of the person who suffered such injury, and

(iii)   (I) have been or will be for diagnosis and medical or other remedial care determined to be reasonably necessary, or
(II) have been or will be for rehabilitation, developmental evaluation, special education, vocational training and placement, case management services,

counseling, emotional or behavioral therapy, residential and custodial care and service expenses, special equipment, related travel expenses, and facilities determined to be reasonably necessary.

§ 15(a)(1)(A).

"[R]easonable projected unreimbursable expenses" must be shown to be "reasonably necessary." § 15(a)(1)(A)(iii). "Special masters have characterized this phrase as a 'vague instruction' and a standard for which there is 'no precise' definition." Lerwick ex rel. B.L. v. Sec'y of Health & Hum. Servs., No. 06-847V, 2014 WL 3720309, at *5 (Fed. Cl. Spec. Mstr. June 30, 2014); see also I.D., 2013 WL 2448125, at *6 (defining "reasonably necessary" to mean "that which is required to meet the basic needs of the injured person . . . but short of that which may be required to optimize the injured person's quality of life" (quoting Scheinfield v. Sec'y of Health & Human Servs., No. 90-212V, 1991 WL 94360, at *2 (Cl. Ct. Spec. Mstr. May 20, 1991))); Bedell v. Sec'y of Health & Hum. Servs., No. 90-765V, 1992 WL 266285 (Cl. Ct. Spec. Mstr. Sept. 18, 1992) (defining "reasonably necessary" to mean "more than merely barely adequate, but less than the most optimal imaginable"); Alonzo v. Sec'y of Health & Hum. Servs., No. 18-1157V, 2023 WL 5846682, at *11 (Fed Cl. Spec. Mstr. Aug. 14, 2023).

### B.    Contentions and Analysis

The parties confirmed the life care plan items in dispute. See Resp. Ex. K; Joint Status Rept., filed Mar. 25, 2026. The undersigned will address each in turn.

### 1.    Vision Care & Eye Doctor Co-Pay

Petitioner requests the deductible for her yearly eye examination ($10.00), while Respondent argues this cost is a routine expense and should not be awarded. Resp. Ex. K at 4, 10. Petitioner's life care planner noted Petitioner reported "increased difficulty seeing due to her eye dryness, related blurriness, and irritation and uses magnifying classes to read small print." Pet. Ex. 109 at 15, 21. The life care planner added that "[Petitioner's] eyes and vision have been impacted by Bell's Palsy, and she is followed by her usual eye doctor/optometrist who has made recommendations and prescribed care." Id. at 19. Further, her treating provider (Dr. Esquivel) "indicated that [Petitioner] has no increased optometry needs beyond her usual follow-up currently." Id.

The undersigned made a preliminary finding awarding the co-pay for one eye exam per year ($10.00 per year). Order dated May 7, 2025, at 1 (ECF No. 137). However, upon review of the records, the undersigned finds Dr. Esquivel's statement shows this is a routine expense that Petitioner would have incurred irrespective of her vaccine injury given her need for corrective lenses prior to vaccination and lack of "optometry needs beyond her usual follow-up." Pet. Ex. 109 at 19. Thus, this expense will not be awarded.

### 2.    NeutraSal Oral Rinse

The parties agree Petitioner is entitled to coverage of NeutraSal, but do not agree with the price for each carton and the amount of cartons per year.  Resp. Ex. K at 19-20.  The life care planners confirmed Petitioner's insurance and Medicare Part D will not cover this cost.

Petitioner contends her dentist indicated Petitioner requires NeutraSal daily, and thus, Petitioner requests $4,817.88 per year to life expectancy for daily usage of NeutraSal Oral Rinse.  Resp. Ex. K at 19 (citing Pet. Ex. 118).  In calculating this amount, Petitioner uses the non-discounted price of $395.99.  Id. (citing Pet. Ex. 122).

Respondent recommends coverage of NeutraSal at a discounted price of $349.36 for half the year, totaling $2,096.16 per year to life expectancy.  Resp. Ex. K at 19.  "Respondent disagrees that the evidence, including the treater letter ([Pet. Ex.] 118), supports the need for daily use of this rinse when other items have been provided in the plan to address dry mouth."  Id. at 20 (citing Pet. Ex. 118).  Respondent recommends six cartons (30 packets in each) "as other products (mouth spray, lozenges[,] & mouthwash) have been provided in the [life care plan] to address dry mouth."  Id. at 19.

Petitioner's dentist emailed Petitioner's life care planner regarding the need for NeutraSal Oral Rinse.  Pet. Ex. 118.  In the email, Petitioner's dentist recommended the following:

> Liz, treatment of [Petitioner's] dry mouth is critical to her oral health.  Without the use of prescription flouride toothpaste like prevident and oral rinses such as NeutraSal she will develop rampant cervical caries.  This could lead to early tooth loss and multiple unnecessary dental procedures.
>
> I do recommend ongoing prescription rinses and toothpaste due to the severity of her dry mouth.  [Over the counter] rinses, lozenges are a nice adjunct but do not replace the need for prescription strength.

Id. at 1.  While the email does not indicate that daily use is needed given Petitioner's complaint of dry mouth, the undersigned finds it is reasonable that she have daily treatment for this symptom.  Therefore, the undersigned finds Petitioner entitled to NeutraSal daily for her life expectancy.

With regard to the price of NeutraSal, Petitioner filed documentation from GoodRx showing the non-discounted price of NeutraSal is $395.99, while the discounted price differs at each pharmacy in Petitioner's area, ranging from $331.76 to $367.91.  Pet. Ex. 112 at 1-12.  Respondent proposes a price of $349.36 per carton.  Resp. Ex. K at 19.  The undersigned will use this price per carton.

Therefore, Petitioner is awarded daily NeutraSal from now to life expectancy at the price of $349.36 per carton.

19

### 3. Dental Floss

Petitioner requests $44.00 per year from now to life expectancy for dental floss; Respondent disagrees and contends this is a routine expense. Resp. Ex. K at 22. Petitioner's life care planner included dental floss in the life care plan because Petitioner's providers have instructed her to floss more often than usual (more than three times per day) to account for her increased dental health issues from food pocketing and food between her teeth. Pet. Ex. 109 at 12, 15, 20.

The undersigned preliminarily awarded $44.00 per year now to life expectancy for dental floss. Order dated May 7, 2025, at 2. The undersigned found this item reasonably necessary to prevent tooth decay due to Petitioner's condition. Id. The undersigned maintains this finding and will award $44.00 per year now to life expectancy for dental floss.

### 4. Tissues

Petitioner requests $77.50 per year from now to life expectancy for tissues, which Respondent disagrees and contends this is a routine expense. Resp. Ex. K at 22. Petitioner's life care planner noted Petitioner "uses multiple tissues each day, to manage drool or food/liquid spillage, to wipe up after applying drops and ointments to her eyes, to blot nasal discharge, etc." Pet. Ex. 109 at 15, 20.

The undersigned preliminarily awarded $77.50 per year now to life expectancy for tissues as Petitioner provided a particular and specific need for this item in her life care plan report. Order dated May 7, 2025, at 3. The undersigned will award this expense and maintains this cost is reasonably necessary. Id. Thus, Petitioner is awarded $77.50 per year now to life expectancy for tissues.

### 5. Aquegel Eucalyptus Moisturizer

Petitioner requests $68.50 per year from now to life expectancy for Aquegel eucalyptus moisturizer. Resp. Ex. K at 22. Respondent contests this cost, arguing it is a routine expense. Id. Petitioner's life care planner explained Petitioner uses this moisturizer for her nasal dryness and to alleviate associated discomfort. Pet. Ex. 109 at 20.

The undersigned preliminarily awarded $68.50 per year now to life expectancy for Aquegel moisturizer as Petitioner provided a particular and specific need for this item in her life care plan report. Order dated May 7, 2025, at 3. The undersigned will award this expense and maintains this cost is reasonably necessary. Id. Thus, Petitioner is awarded $68.50 per year now to life expectancy for Aquegel moisturizer.

### 6. Humidifier

Petitioner requests costs of a humidifier ($90.00 now and then $45.00 per year to life expectancy); Respondent argues this is a routine expense and should not be awarded. Resp. Ex.

K at 28. Petitioner's life care planner noted "[s]he uses a humidifier in her bedroom to help with nasal, mouth, and eye dryness." Pet. Ex. 109 at 16.

The undersigned preliminarily awarded $90.00 now and every three years to life expectancy for a humidifier. Order dated May 7, 2025, at 3. The undersigned will award this expense, finding this cost is reasonably necessary. Thus, Petitioner is awarded $90.00 now and every three years to life expectancy for a humidifier.

## V.    CONCLUSION

In determining an award in this case, the undersigned does not rely on a single decision or case. Rather, the undersigned has reviewed the particular facts and circumstances in this case, giving due consideration to the circumstances and damages in other cases cited by the parties and other relevant cases, as well as her knowledge and experience adjudicating similar cases.

In light of the above analysis, and in consideration of the record as a whole, the undersigned finds that Petitioner should be awarded (1) $180,000.00 for pain and suffering and (2) and an amount sufficient to fund the life care plan items agreed upon by the parties as well as those awarded herein.

The parties are to file a joint status report within 30 days, **by Monday, April 27, 2026**, (1) providing a complete and final life care plan which takes into consideration the items adjudicated herein, (2) providing a joint status report confirming the amount of damages the parties previously agreed upon for lost wages and out-of-pocket expenses, and (3) confirming that all items of damages have now been resolved and that no issues remain outstanding.

In the absence of a motion for review filed pursuant to RCFC Appendix B, the Clerk of the Court **SHALL ENTER JUDGMENT** herewith.[15]

**IT IS SO ORDERED.**

<u>**s/Nora Beth Dorsey**</u>
Nora Beth Dorsey
Special Master

---

[15] Pursuant to Vaccine Rule 11(a), entry of judgment is expedited by the parties' joint filing of notice renouncing the right to seek review.